1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 DOUGLAS WALKER | Case No. 1:21-cv-01412-JLT-CDB (HC) |
| 12                     Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**[1] |
| 13          v. | |
| 14 BRIAN CATES, Warden | |
| 15                     Respondent. | **14-DAY DEADLINE** |
| 16 | (Doc. 1) |
| 17 | |

18         On September 23, 2021, Petitioner Douglas Walker ("Petitioner"), a state prisoner

19 proceeding pro se, filed a petition for writ of habeas corpus alleging four grounds for relief

20 ("Petition"). (Doc. 1). Because three of the four grounds were unexhausted, the district court

21 dismissed the unexhausted grounds on May 23, 2022. (Doc. 17; *see* Doc. 15). On July 21, 2022,

22 Respondent filed an answer (Doc. 19), arguing Petitioner was not entitled to habeas relief on his

23 sole remaining ground, and lodged the state court record in support (Docs. 12, 12-1 through 12-5,[2]

24 20, 20-1 through 20-12). Petitioner did not file a traverse or any other response and the time to do

25 so has expired. For the reasons set forth below, the undersigned recommends that the district

26 court deny the Petition and decline to issue a certificate of appealability.

27 _____

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(17) (E.D. Cal. 2022).

28 [2] Respondent previously filed portions of the state court record relevant to addressing the exhaustion issue.

1

## I.    PROCEDURAL AND FACTUAL BACKGROUND

Following a court trial, Petitioner was convicted in the Fresno County Superior Court of (1) inflicting corporal injury on a cohabitant in violation of Penal Code § 273.5(a);  (2) three counts of attempting to dissuade a witness/victim from reporting that victimization to law enforcement and judicial officers in violation of Penal Code § 136.1(b)(2); and (3) misdemeanor contempt of court for violation of a criminal protective order pursuant to Penal Code § 166(c)(1).[3] (Doc. 20-2 at 81; Doc. 12-2 at 2).[4]  The court sentenced defendant to an aggregate prison term of 19 years determinate, plus a consecutive term of 25 years to life pursuant to the three strikes law. (Doc. 12-2 at 2; Doc. 12-1).

On appeal, the Fifth Appellate District Court of Appeal summarized the pertinent facts of the underlying offenses:[5]

> K.A. was the victim in this case, and she was living on Andrews Avenue in an apartment building on the night of the incident, February 25, 2014. K.A.'s neighbor, Rain, was living with his spouse and child in an apartment next door to K.A. At around midnight on February 25, Rain heard banging on the front door. When Rain opened the door, K.A. appeared and she was crying, upset and frantic. Rain and his spouse allowed K.A. to come into their apartment and tried to calm her down. K.A. kept repeating that she was scared and fearful, and she expressed concern about her mother who was still in K.A.'s apartment. Rain heard K.A. say, "he's going to kill me." Rain and his spouse assumed K.A. was afraid of her husband, but K.A. said it was not her husband; Rain thought K.A. said it was her boyfriend, although she never identified a boyfriend. K.A. had a bloody nose, and she kept telling them someone was going to come to the door and that they should not open it. To help calm K.A., Rain and his spouse turned off the lights in the front of the apartment and locked the door and did not open it again until the police arrived and identified themselves.
>
> K.A. had a small bottle of alcohol with her, but the bottle was empty, and she threw it away while she was in Rain's apartment. Rain's spouse called 911, and while his spouse was speaking with the dispatcher, K.A. was making statements in the background. K.A. can be heard on the 911 recording saying, "his name is Doug," she identifies herself as K.A., she can be heard saying, "[n]o" to the

---

[3] Petitioner was found not guilty on an additional dissuading a witness charge and a charge of making criminal threats.  (Doc. 12-2 at 2).

[4] Record citations herein are to the CM/ECF-assigned pages.

[5] These facts are entitled to a rebuttable presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

2

question whether she needed an ambulance, and referencing, "my mom" and "my house."

Another of K.A.'s neighbors, Cecelia B., testified at trial. Cecelia had been living on Andrews Avenue with her daughter, Asia, in an apartment that shared a wall with K.A.'s apartment. Cecelia was on friendly terms with K.A., who had frequently visited Cecelia at Cecelia's and Asia's apartment. Cecelia had seen injuries on K.A. in the past, and in the two weeks before February 25, she had seen K.A. "beat all up," "like, … maybe her jaw could have been broken"; Cecelia also observed redness on K.A.'s face and big bruises.

Cecelia was familiar with defendant. K.A. had told her defendant was living with K.A., Cecelia had seen him coming out of that apartment at times with K.A., and she thought they were in a dating relationship as she had seen them holding hands and coming and going from the apartment together.

Cecelia had seen defendant earlier that day somewhere else. That night, she heard bumping and fighting through the wall shared with K.A.'s apartment. Later, when Cecelia was coming out of her apartment, she saw K.A. getting out of a police car, and then K.A. approached Cecelia and asked to use her cell phone. This was not unusual in one respect because K.A. had often asked to borrow Cecelia's cell phone to make calls. To Cecelia, K.A. seemed nervous.

K.A. made a call with the phone in speaker mode, and Cecelia listened to the entire conversation while an officer stood by. Cecelia heard the man on the call say he was at a bus stop, and K.A. asked him for the location. K.A. accused the man of acts of violence, and she told him he should not have used a bat; he responded she should not have done something, that she should not have gone "in[to] his pocket or something." Cecelia recognized the voice on the phone as defendant because K.A. was using his name, but also because Cecelia had spoken to defendant before in passing. Moreover, in the early hours of the next morning, around 2:00 or 3:00 a.m., the same male voice called Cecelia's cell phone and asked to speak with K.A.; at that time, he identified himself as "Dougie."

Asia Brown testified she knew K.A. as the "cool" neighbor who would come over to the apartment Asia shared with Cecelia, and they would talk quite often. K.A. lived in the unit next to Asia and her mother, which had a common wall. Asia was familiar with defendant, and she knew him as K.A.'s boyfriend. Asia believed they were in a relationship and lived at K.A.'s apartment because K.A. had told them so. Defendant was there every day, and she had seen him coming and going out of the apartment at all hours of the day.

On the night of the incident, Asia heard noises through the wall shared with K.A., including bumping noises; she could not identify particular voices, but heard what she thought sounded like

3

wrestling, tussling, and maybe screaming. In the two weeks before the incident, she had seen K.A. with physical injuries, including her face appearing "really big and bruised." K.A.'s arm or hand seemed affected too, the bruising on her face encompassed nearly her entire face, and Asia thought perhaps there was an open cut above one of K.A.'s eyebrows.

On the night of the incident, Asia was aware that her mother loaned K.A. a cell phone, and Asia was present when K.A. was speaking on the speaker phone outside the apartment door while the police were there. Asia could tell it was defendant on the other end of the line because she knew his voice from the other times they had spoken, which she estimated included more than 10 brief interactions; additionally, she heard K.A. calling him "Doug" while they were on the phone. According to Asia, K.A. was trying to lure Doug back to the apartment. K.A. accused him of being violent toward her, and she said, "[w]hy did you hit me?" or "[w]hy did you hurt me[?]" or words to that effect. Asia also heard K.A. say, "[y]ou hit me with a baseball bat," and Asia believed defendant responded that he did not mean it, or words to that effect. Asia did not remember defendant saying to K.A. that she should not have gone through his pockets; instead, Asia recalled he apologized with the words, "I'm sorry."

Officer Matthew Paley testified that he was working as patrol on the night of the incident with Officer Ronnie Pack. They were dispatched to Andrews Avenue based on a domestic violence call. Paley was the assisting officer, so while Pack was making contact with K.A., Paley was interviewing witnesses and canvassing.

Paley spoke with Asia and Cecelia, and he was also present for a cell phone conversation projected by speakerphone between K.A. and a man. Palely testified he was trying to ascertain the location of the suspect, and he was encouraging K.A. to elicit some clue as to where the suspect was located so the police could find him. Paley had never contacted defendant before; K.A. identified the person on the phone as her boyfriend. Paley did not recall if he was present for the entire conversation. After the call, Paley reported driving around the area looking at some bus stops to see if anyone there matched the description of the suspect. Paley testified he did not recall whose idea it was to contact the suspect by cell phone; he reiterated he did not hear much of the conversation—his primary focus was the suspect's location; he remembered hearing a man's voice, but not what the man was saying, and he did not stay nearby for the entirety of the call.

Officer Pack testified he was dispatched with Paley to Andrews Avenue based on a report that a female was screaming that she had been assaulted by her boyfriend. Pack contacted K.A. around the corner from her apartment; she was fearful and "just kind of all over the place emotionally." Pack was able to get a statement from her, but it was difficult because she was jumping around in her narrative, so the information came from her in bits and pieces. During the interview, K.A. appeared afraid and her facial expressions registered fear; she seemed to be intoxicated by the

4

way she slurred her speech, and Pack detected an odor of alcohol emanating from her. Pack noted K.A. had a black eye on her left side, and she had red marks near her right eye, and some redness on her chin. During the interview, he went into K.A.'s apartment looking for her elderly mother who was living with her, as K.A. was concerned that her mother might have been harmed; when they located K.A.'s mother in the apartment, however, she was safe.

Pack testified K.A. demonstrated how her attacker raised a wooden dowel in her right hand—she held the dowel in her right hand, above her head and shoulders, onehanded. The dowel was used as a security device on the sliding glass doors in the apartment; Pack did not collect the dowel as evidence, and it was not investigated. Pack showed K.A. a picture of defendant, and K.A. identified him as the person who assaulted her.

Officer Scott Payn testified that he was dispatched to Andrews Street the day after the incident because police had received an anonymous phone call that the suspect, defendant, was at that location. When he arrived at the location, two other officers were already there, and they spent about 30 minutes attempting to make contact with anyone in the apartment by knocking and announcing their presence. They obtained keys from the manager, entered the apartment, and arrested defendant.

Justin Williamson, an investigator with the district attorney's office, met with Rain on March 6 to discuss the incident. According to Williamson, Rain told him that K.A. kept repeating over and over, "he's going to kill me." K.A. also indicated to Rain that she was scared because her mother was still in her apartment. Rain told Williamson that K.A. stated whomever she was afraid of had a baseball bat or a pole and that he had already hit her once. Rain also told Williamson that he and his spouse had turned off the lights in the front room and locked the doors, just in case someone was looking for K.A. To Williamson, Rain seemed upset when recounting the incident and recalling what happened.

Williamson testified he also spoke with K.A. on March 6 about the incident. He observed K.A. emanated fear and anger, and he sensed she was recanting her original story. She became emotional when they discussed the court process and what to expect as a victim of domestic violence. He observed K.A. had bruising on her face that appeared to be in the healing process. Williamson also spoke with Cecelia and Asia that same day. On the night of the incident, Asia reported she heard K.A. say something through the wall to the effect of, "[p]lease, don't. No." Cecelia and Asia recounted that K.A. had used Cecelia's cell phone to contact defendant that night. When K.A. was on the phone with defendant, Cecelia said she heard K.A. indicate defendant had tried hitting her with a bat, and that defendant replied that K.A. should not have gone through his pockets. Cecelia also reported she knew it was defendant on the phone because defendant called her later that night and identified himself as "Dougie."

5

On February 28, defendant was charged with causing corporal injury to a cohabitant/dating partner in violation of section 273.5, subdivision (a). On March 7, appellant was served with a protective order that precluded "any contact personal, electronic, telephonic, or written" with K.A. After defendant was arrested, he made several recorded phone calls from the jail to K.A., encouraging her to avoid coming to court, to avoid service of a trial subpoena upon her, and to recant her story that defendant injured her on February 25. Specifically, on March 10, at approximately 5:58 p.m., defendant called her and told her not to talk to the attorney with the district attorney's office or anyone else. K.A. also told defendant she could "play it off as … you know I was f***in' pissed and then I f***in' came home and you're gone. You f***in' left. I go oh f*** he's over there f***in' this b**** now. Oh hell no. It's like alright mother f*****, you're going down now. I didn't realize that how how serious it was gonna be. You know?"

Later the same day, on March 10, defendant called K.A. and, during the course of the conversation asked her, "why don't you dodge the next subpoena? Just don't answer the door whatever and just you know what I mean?"

On March 11, defendant again called K.A. and they discussed her not being available to accept a subpoena:

"[K.A.]: I, If they come uh if they come trying to subpoena me again[,] they ain't getting in the door.

"[Defendant]: No don't. Don't even answer the door. Just act like you're not even there babe. [¶] … [¶] Don't answer the door. Don't even accept a subpoena. You know what I mean?"

On March 16, defendant again called K.A. and they discussed K.A. recanting her story at the preliminary hearing and attempting to evade a trial subpoena.

"[Defendant]: …listen, listen. There's a guy in here right now right … [¶] … [¶] …that's already had, that's already had two domestics. [¶] … [¶] The, and he beat both of them[,] right? [¶] … [¶] Right, and… [¶] … [¶] he already told me how to go about it, right? [¶] … [¶] This is what we're gonna do. This is what we're gonna do. This is what we're gonna do, listen. He told me if she's recanting her story and saying you didn't do it or nothing, right. [¶] … [¶] He goes have her come to the preliminary hearing, which that's the fourth. He goes have her get on the stand and recant her story and everything and tell 'em you didn't do it. He goes then if they still bound you over for trial, the judge don't throw it out right then, and they bound you uh for trial… [¶] … [¶] …when it comes trial time, for you to go to court for trial. [¶] … [¶] He goes, and they try and subpoena her or whatever, he goes have her just get ghost and don't show up for the trial. He goes then they have to throw it out because there's no witness and he goes and, and to top it off, she already came to the preliminary hearing and told them you didn't do it. So so… [¶] … [¶] …when you get ready for trial, if

1
2
3
4
5
6
7
8
9
10
11
12
13

she's not there, if she don't show up for court, they have to throw it out and let you out. [¶] … [¶] He goes, I already beat two domestics doing it like that. [¶] … [¶] And what I'm gonna do is, I'm gonna have f***in' Shy come pick you up and take you to Calwa if I have to. You know what I mean? [¶] … [¶] To stay over there during the trial so they don't try and f***in' uh, uh, uh, put an attachment to you. Put somebody with you or something. You know what I mean to make sure you come… [¶] … [¶] Okay but, but I'm telling you, if we go to trial I need you to be gone because the DA will try and come get you. Then he'll send cops to come get you, all that, [¶] … [¶] And then we can't have, they might. They might try to, yeah. [¶] … [¶] So that's why I need you to be gone. You know what you do? You know, you know what you do that week of trial, right? [¶] … [¶] Just go stay at your f***in', go stay at your daughter's for a couple of days, alright? And then, but what they'll do, they'll postpone it, they'll postpone the trial, until they try and locate you. You know what I mean? [¶] … [¶] So you're just gonna have to, you're gonna … just have to not be answering your phone. You're gonna, just gonna have to stay gone, alright? [¶] … [¶] That, all that don't matter. You [know] you just … make sure you're gone. Don't don't accept no subpoena, nothing. You know what I mean? [¶] … [¶] I want you to recant your story and everything."

14
15
16
17
18
19
20

(Doc. 12-2 at 4-10 (footnote omitted)).  The state appellate court "remanded to allow the trial court to consider whether to exercise its discretion to strike the prior serious felony enhancement pursuant to Senate Bill No. 1393 … and to allow the trial court to consider whether consecutive or concurrent sentences should be imposed as to counts 4 and 5." (*Id.* at 33).  The court otherwise affirmed Petitioner's convictions. (*Id.* at 34).  On July 10, 2020, the California Supreme Court summarily denied review. (Doc. 12-4).  On remand, the trial court declined to modify the previously imposed sentence. (Doc. 12-5).

21
22
23

Petitioner's sole remaining claim before this Court challenges the sufficiency of the evidence to support his conviction on count one for inflicting corporal injury on a cohabitant. (Doc. 1 at 4).

24

## II.     STANDARD FOR FEDERAL HABEAS RELIEF

25
26
27
28

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

first "exhaust[t] the remedies available in the courts of the State."[6]  28 U.S.C. § 2254(b)(1)(A).
Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas
relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as determined by the Supreme Court
of the United States," or (2) "resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding."  28
U.S.C. § 2254(d).

"Deciding whether a state court's decision 'involved' an unreasonable application of
federal law or was 'based on' an unreasonable determination of the facts requires the federal
habeas court to 'train its attention on the particular reasons—both legal and factual—why state
courts rejected a state prisoner's federal claims."  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).
When the state court's decision "does not come accompanied with [its] reasons" for the decision,
a federal court "should 'look through' the unexplained decision to the last related state-court
decision that does provide a relevant rationale."  *Id.*  However, when there is no reasoned decision
to "look through," it may be presumed—in "the absence of any indication or state-law procedural
principles to the contrary"—that the state court adjudicated the claim on the merits and the
petitioner must show "there was no reasonable basis for the state court to deny relief."
*Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

Under 2254(d)(1), a decision is "contrary to" clearly established federal law if the state
court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case
law; or (2) reached a different result from the Supreme Court when faced with materially
indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).  A state court decision
involves an "unreasonable application" of the Supreme Court's precedents if the state court
correctly identifies the governing legal principle but applies the facts of the petitioner's case in an
objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state
court either unreasonably extends a legal principle from [Supreme Court] precedent to a new
context where it should not apply or unreasonably refuses to extend that principle to a new

---

[6] The statute allows for limited exceptions inapplicable here.  *See* 28 U.S.C. § 2254(b)(1)(B).

context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington*, 62 U.S. at 101. The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

## III.    ANALYSIS

Petitioner exhausted his sufficiency of the evidence claim by presenting it to the state courts on direct review and Respondent does not dispute that Petitioner has exhausted this claim. Accordingly, the claim must be evaluated under the deferential AEDPA standard. Because the California Supreme Court summarily denied Petitioner's request for review, this Court looks to the opinion of the Fifth Appellate District as the last reasoned decision. *See Wilson*, 584 U.S. at 125.

### A.    Background

At trial, the judge summarized the evidence he concluded supported Petitioner's conviction for inflicting corporal injury on a cohabitant. (Doc. 20-6 at 19-23). As to the relationship between Petitioner and K.A., the judge found it was "clearly established" based on transcripts of jail calls between Petitioner and K.A. and testimony from other individuals that the two were "in contact on a regular basis prior to the date of these injuries being reported." (*Id.* at 20). As to whether K.A. "was struck and did the actions of [Petitioner] cause traumatic condition," the court pointed to K.A.'s "hysterical statements" to neighbors, officers, and heard in

the background of a 9-1-1 call, and concluded these statements were "sufficiently credible to at least get to a prima facia showing that [Petitioner], someone named Dougie, who is known to her, struck her and caused the injuries." (*Id.* at 20-21). The judge specifically addressed K.A.'s credibility, concluding "some of the circumstances of that report lend credibility to the report," including K.A.'s unwillingness to provide Petitioner's full name, her fear, and her repeated instructions not to open the door. (*Id.* at 21). Overall, the judge concluded K.A.'s behavior was "not consistent with somebody falsely attributing a domestic violence incident to someone who is not guilty of doing so." (*Id.* at 22). The court relied on photographs of the injuries as well as testimony from witnesses to support that K.A.'s injuries were a traumatic condition. (*Id.* at 22-23).

Petitioner challenged the sufficiency of the evidence in support of this conviction on appeal. The appellate court rejected Petitioner's argument and concluded substantial evidence supported his conviction. (Doc. 12-2 at 20-23). The appellate court explained:

> There was ample evidence from witnesses who overheard some of the interactions between defendant and K.A. and who were able to speak with K.A. immediately following the incident and observe her injuries and condition. For example, Asia and Cecelia testified they heard fighting through their shared apartment wall with K.A. When K.A. sought help from the neighbors immediately following the incident, she was very frightened to the extent Rain testified they locked the door and shut off the lights to calm her down. K.A. was also very frightened for her mother, who was still in her apartment. During the 911 call, K.A. identified her assailant as a man named Doug, and she told Rain the person who she was frightened of was "going to kill [her]." K.A. had a bloody nose, and Rain gave her frozen strawberries to apply to the swelling on her face. Officer Pack noted K.A.'s left eye was black, she had red marks on her right eye, and some redness on her chin. K.A. identified a photograph of defendant as the person who had assaulted her. She appeared to Pack to be fearful, and she was worried defendant had harmed her mother, who was still in the apartment.
>
> When K.A. made the call to defendant on Cecelia's cell phone, she accused defendant of hitting her and he adopted the admission by not refuting her statement and saying words to the effect that she should not have gone through her things, and he was sorry. K.A.'s reaction to the incident, her fear of defendant, her frightened behavior in fleeing her apartment and seeking help from the neighbors, her worry for her mother (who remained in the apartment), K.A.'s identification of defendant as her assailant, and K.A.'s visible injuries all constituted substantial evidence from

which it can be reasonably inferred defendant struck her intentionally and willfully. While there was some doubt about how defendant had struck her—the court did not believe her injuries were consistent with being struck by a dowel or a bat—that he intentionally struck her and caused her traumatic injury was supported by the evidence.

…

Here, the victim herself made statements and exhibited injuries and behavior from which reasonable inferences arose that defendant *willfully* caused her traumatic injury. K.A. was frightened when she sought help from the neighbors, and she appeared frightened when interviewed by the officers; she was worried about her mother, who was still in the apartment; she identified defendant as her assailant to officers and in the 911 call; and K.A. had observable injuries on her face. Had defendant's conduct been unintentional or defensive in nature, it is unlikely K.A. would have exhibited such fear and agitation. Defendant also made adoptive admissions over the phone that indicated he intentionally and willfully injured K.A. Considering the entire record, there was substantial evidence to support defendant's conviction on count 1 under section 273.5, subdivision (a). (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357 ["A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." ].)

(*Id.* at 20-23).

## B. Law and Analysis

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), which sets forth the federal standard for determining a sufficiency of the evidence claim, such a claim "can only succeed when, viewing all the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018) (quotation and citation omitted). Federal courts look to state law for the elements of the specific offense at issue. *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1218 (9th Cir. 2018). When a federal habeas court reviews an insufficiency claim previously rejected on the merits by the state court, "a second level of deference applies under AEDPA" such that, to prevail, a petitioner must show that the "state court's determination that a rational jury could have found each required element proven

1   beyond a reasonable doubt was not just wrong but was objectively unreasonable." *Johnson*, 899

2   F.3d at 1056-57.

3   Penal Code § 273.5 punishes "[a] person who willfully inflicts corporal injury resulting in

4   a traumatic condition" upon "someone with whom the offender has, or previously had, an

5   engagement or dating relationship." Cal. Penal Code § 273.5(a)-(b). For purposes of the statute,

6   a "'[d]ating relationship' means frequent, intimate associations primarily characterized by the

7   expectation of affectional or sexual involvement independent of financial considerations." Cal.

8   Penal Code § 243(f)(10). "Corporal injury" is "defined using its ordinarily understood language

9   and plain meaning" such that it requires hurt, damage, or loss sustained by the body. *People v.*

10  *Reid*, 105 Cal. App. 5th 446, 456 (2024). "[T]raumatic condition" is statutorily defined as "a

11  condition of the body, such as a wound, or external or internal injury, including, but not limited

12  to, injury as a result of strangulation or suffocation, whether of a minor or serious nature, caused

13  by physical force." Cal. Penal Code § 273.5(d).

14  Here, Petitioner fails to present any argument as to how the state court's decision was

15  wrong or objectively unreasonable. In fact, Petitioner's entire argument consists of two

16  sentences: (1) the initial ground two listed as "[t]here was insufficient evidence to prove all

17  elements of the offense as charged in violation of Petitioner's rights to Due Process and a fair

18  trial;" and (2) the supporting facts, baldly asserting "[t]here was insufficient evidence prodeuced

19  [sic] to establish that the elements of inflicting a traumatic injury on a spouse, as charged in count

20  one, in violation of the Due Process Clause of the United States Constitution." (Doc. 1 at 4).

21  However, "[c]onclusory allegations which are not supported by a statement of specific facts do

22  not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Thus, Petitioner has

23  not shown he is entitled to relief.

24  Further, a review of the record reveals that sufficient evidence supported Petitioner's

25  conviction. At trial,[7] the parties stipulated to the admission of recorded calls between Petitioner

26  and K.A. which contained declarations of love, use of pet names, and discussions implying a

27  sexual relationship. (*See* Doc. 20-1 at 239-40, 244, 248, 257, 262-63). Additionally, witnesses

28

---

[7] K.A. died of natural causes before the case proceeded to trial. (*See* Doc. 20-4 at 12).

testified to seeing Petitioner and K.A. together.  (Doc. 20-4 at 29-30, 63).  As to the events of February 25, 2014, K.A.'s neighbors testified to hearing "bumping and fighting" from K.A.'s apartment.  (*Id.* at 32, 65).  K.A. borrowed a cell phone from a neighbor, called Petitioner on speakerphone, and while on the phone told him "You shouldn't have used a bat," to which Petitioner responded that she should not have gone in his pockets, or he did not mean to.  (Doc. 20-4 at 40, 75, 82-84).  A separate neighbor testified that K.A. came to his apartment frantic and beaten up, talking hysterically, crying, expressing fear that her mother was still in her apartment, and asking to close and lock the doors.  (Doc. 20-5 at 46-50).  A recorded 9-1-1 call included statements from K.A. that "his name is Doug" and asking to lock the doors.  (Doc. 20-2 at 73-77; *see* Doc. 20.5 at 49-50).  Officer Pack testified that during his interaction with K.A., he asked her to show him how Petitioner used a wooden dowel during the incident and "[s]he took the dowl in her right hand and held it up above her shoulders and above her head" at an angle, "like it was in like a striking motion."  (Doc. 20-5 at 21).  K.A. identified Petitioner as the suspect to Officer Pack.  (*Id.* at 22).  K.A. "was very upset" and "seemed very scared" during her interactions with police.  (*Id.* at  24, 30).  Pictures of K.A.'s injuries were also admitted as evidence.  (*See* Doc. 20-5 at 11-17).

Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner and K.A. were in a relationship, Petitioner willfully inflicted bodily harm on K.A., and K.A. suffered an injury as a result.  As such, the state court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  The undersigned recommends that the Petition be denied.

### IV.    CERTIFICATE OF APPEALABILITY

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application."  *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability

1     will issue "only if the applicant has made a substantial showing of the denial of a constitutional

2     right." 28 U.S.C. § 2253(c)(2). To make this showing for claims rejected on procedural grounds,

3     a movant must demonstrate "that jurists of reason would find it debatable whether the petition

4     states a valid claim of denial of a constitutional right and that jurists of reason would find it

5     debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S.

6     473, 484 (2000). When a claim is rejected on the merits, the petitioner "must demonstrate that

7     reasonable jurists would find the district court's assessment of the constitutional claims debatable

8     or wrong" to warrant a certificate of appealability.

9         Because Petitioner has not made a substantial showing of the denial of a constitutional

10    right, the undersigned recommends that the court decline to issue a certificate of appealability.

11    **V.**      **RECOMMENDATION**

12         For the reasons set forth above, it is **RECOMMENDED**:

13      1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 1);

14         and

15      2.  Petitioner be denied a certificate of appealability.

16         These findings and recommendations are submitted to the district judge assigned to this

17    action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the

18    United States District Court, Eastern District of California. Within **14 days** of service of this

19    recommendation, any party may file written objections to these findings and recommendations

20    with the Court and serve a copy on all parties. Such a document should be captioned "Objections

21    to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without

22    leave of Court and good cause shown. The Court will not consider exhibits attached to the

23    Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the

24    exhibit in the record by its CM/ECF document and page number, when possible, or otherwise

25    reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be

26    disregarded by the District Judge when reviewing these Findings and Recommendations under 28

27    U.S.C. § 636(b)(l)(C). The parties are advised that failure to file objections within the specified

28

1  time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d

2  834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

3  IT IS SO ORDERED.

4  Dated:   **March 12, 2025**   _____

5  UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28